**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JEFFREY T. TEST,

    Plaintiff,

       v.

ERIC H. HOLDER, Attorney General,[1]

    Defendant.

Civil Action No.  07-0225 (JDB)

## MEMORANDUM OPINION

Plaintiff Jeffrey Test, a former employee at the United States Department of Justice, brings this employment discrimination and retaliation action against defendant Eric H. Holder in his official capacity as the Attorney General of the United States.  Now before the Court are the parties' cross-motions for summary judgment.  Upon careful consideration of the motions and the parties' memoranda, the applicable law, and the entire record, Test's motion is denied in full and defendant's motion is granted in part and denied in part.

## BACKGROUND

In 1986, while on duty with the U.S. Marine Corps, Test was injured in a military training exercise.  He shattered bones in both legs and was diagnosed with Compartment Leg Syndrome ("CLS").  Because of the military accident and the resulting CLS, the U.S. Veterans' Administration certified that Test has a 10% disability rating in each leg.  See Pl. Mem. Exs. 4-

---

[1] Former Attorney General Alberto Gonzales was named as the original defendant in this case.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court automatically substitutes the current Attorney General, Eric H. Holder, as the new defendant.

5.[2]  Despite the CLS and disability rating, however, Test has worked without accommodation his entire life.  See Deposition of Jeffrey Test at 84.

At all times relevant to this action, Test was employed as the Director of the Information Technology Division in the Office of the Chief Information Officer, which is part of the U.S. Justice Department's Office of Justice Programs ("OJP").  Compl. ¶ 3.  On April 28, 2006, Test submitted a written request for a "maxi-flex" schedule, in which he proposed a schedule that would allow him to work 80 hours per two-week period yet receive one fixed day off.[3]  Then, for the next two months, facts unfolded on two separate but parallel tracks.

Test's schedule request was denied on May 2, 2006.  Id. ¶ 21.  On May 12, 2006, he received a mid-year review from his supervisors, during which he was told that "everything looks pretty good, things are going pretty well."  Pl.'s EEO Interview, Oct. 31, 2006, at 16 (attached as Pl. Mem. Ex. 6).  On May 18, 2006, Test met with Stacie Brockman, the OJP EEO Officer.  Compl. ¶ 22.  Test informed Brockman that he believed that he was denied his schedule request because of his disability and asked Brockman to notify his supervisors that he had sought EEO relief.

Meanwhile, on May 4, 2006, Test's supervisor, Kyle Holtzman, was informed that Test

---

[2] The briefing on the cross-motions for summary judgment is comprised of the following: Plaintiff's Memorandum in Support of Summary Judgment ("Pl. Mem."); Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Def. Opp."); Plaintiff's Reply in Support of Summary Judgment ("Pl. Rep."); Defendant's Surreply in Opposition to Summary Judgment ("Def. Sur."); Defendant's Memorandum in Support of Summary Judgment ("Def. Mem."); Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl. Opp."); and Defendant's Reply in Support of Summary Judgment ("Def. Rep.").

[3] Test requested the schedule "due to the impact the negative impact the regular work schedule has on my family."  See Def. Mem. Ex. A.  Test did not request the scheduling change because of a disability, and he has not made a claim that he was unlawfully denied "reasonable accommodation."

had tossed a large book in the direction of several other employees on May 3, 2006, triggering an investigation into other allegations of misbehavior by Test.  See Notice of Proposed 5-Day Suspension (attached as Def. Mem. Ex. C).  On May 23, 2006 -- five days after Test met with Brockman -- Holtzman entered Test's office and stated that people were "gunning" for Test.  See Pl.'s EEO Interview at 58.  On June 5, 2006, Holtzman issued a notice of a proposed five-day suspension, which was transmitted to Test on June 12, 2006.  Pl.'s EEO Interview at 32.

At this point, the two tracks merge back together.  Test was provided with an opportunity to respond in writing to his notice of proposed suspension.  Test responded on June 27, 2006.  Def. Mem. Ex. C.  In his response, he revealed his EEO activity to his supervisors, Holtzman and Gerald Fralick.  Id.

On July 6, 2006, Holtzman again entered plaintiff's office, stating that Test's EEO activity was "killing" Holtzman.  See Compl. ¶ 28.  Around the same time, Test's supervisors allegedly began allowing employees and contractors who normally reported to Test to circumvent his authority, see id. ¶ 23, and began to schedule meetings when Test would be out of the office, see id. ¶¶ 24-25.  On August 3, Test filed a formal EEO complaint, see Pl. Mem. Ex. 23, and on August 9 he was formally issued his suspension, which had been reduced to two days, see Pl. Mem. Ex. 2.  At the conclusion of the suspension, Test was refused re-entry into his office building for several hours.  See Compl. ¶ 31.  In September 2006, Test's supervisors refused to discuss an "individual development plan" with him.  Id. ¶ 35.  On October 27, 2006, Test received a "successful" performance evaluation and did not receive a performance bonus.  See id. ¶¶ 32-33, Pl. Mem. Ex. 21.  Test filed suit in this Court on January 31, 2007.

**STANDARD**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by identifying those portions of "the pleadings, the discovery and disclosure materials on file, and any affidavits" that it believes demonstrate the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323. In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

**ANALYSIS**

**I.     Test's Disability Discrimination Claim**

To prevail on a disability discrimination claim under the Rehabilitation Act, 29 U.S.C. §

701, et seq., a plaintiff must demonstrate that he is disabled and that he has suffered an adverse employment action because of that disability.[4]  See Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  According to Test, he satisfies these elements here because:  he has a disability (CLS); the denial of his maxi-flex schedule request constitutes an adverse employment action; and the denial was because of his disability.  See Pl. Mem. at 2.

Defendant challenges Test's claim that he is disabled.  Because he is not disabled, defendant asserts, Test has no viable disability discrimination claim.  See Def. Mem. at 5.  Under the Rehabilitation Act, a person is disabled if he has "a physical or mental impairment which substantially limits one or more of his major life activities." 29 U.S.C. § 705(20)(B).  Pointing to cases like Toyota Motor Manufacturing v. Williams, 534 U.S. 184 (2002), defendant argues that the word "substantially" contemplates a demanding standard.  See Def. Mem. at 7-8.  And deposition testimony reveals that Test can walk (albeit with an impaired gait), fly airplanes, scuba dive, and work without accommodation.  This, defendant maintains, shows that Test is not disabled under the meaning of the Rehabilitation Act.

Test responds that defendant's framing of the legal standard ignores the impact of recent

---

[4] Test's complaint alleged disability discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, rather than the Rehabilitation Act.  On December 9, 2008 -- nearly two years after filing his original complaint -- Test sought leave to amend his complaint to incorporate a Rehabilitation Act claim.  The Court denied his motion to amend on January 15, 2009.  But because the standards for discrimination under the various employment discrimination statutes are very similar, and because Test has consistently alleged disability discrimination, defendant is not prejudiced if the Court considers Test's complaint under the Rehabilitation Act rather than the Civil Rights Act.  Accordingly, the Court will not dismiss Test's discrimination claim for improper pleading and will instead proceed as though he had properly alleged disability discrimination under the Rehabilitation Act.

amendments to the Americans with Disabilities Act.[5]  Pl. Rep. at 10.  The "Findings" section of

the ADA Amendments Act of 2008 states that cases like <u>Toyota Motor</u> have "narrowed the broad

scope of protection intended to be afforded by the ADA."  <u>See</u> ADA Amendments Act of 2008

§ 2(a)(5), Pub. L. No. 110-325, 122 Stat. 3553.  Accordingly, the stated purpose of the ADA

Amendments Act is "to reject the standards enunciated by the Supreme Court in <u>Toyota Motor</u>

. . . that the terms 'substantially' and 'major' in the definition of disability under the ADA 'need to

be interpreted strictly to create a demanding standard for qualifying as disabled.'"  <u>Id.</u> § 2(b)(4).

Defendant argues that Test is too late in invoking the ADA Amendments Act -- he raised

the issue for the first time in his reply brief, even though the Act became law before summary

judgment briefing began.  Def. Sur. at 1-2.  Moreover, defendant contends, Test improperly seeks

to apply the amendments retroactively despite the Act's express January 1, 2009 effective date.[6]

<u>See</u> ADA Amendments Act § 8.  But whether Test is disabled and whether the ADA

Amendments Act impacts that analysis is something the Court need not resolve.  Even assuming

he is disabled, Test has not demonstrated that he has suffered disparate treatment or was

discriminated against <u>because of</u> his disability.

The framework for analyzing whether a plaintiff has suffered an adverse employment

action because of his disability is as follows:

> [W]here an employee has suffered an adverse employment action

---

[5] "The standards used to determine whether the Rehabilitation Act has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the [ADA]."  <u>See</u> <u>Breen v. Dep't of Transp.</u>, 282 F.3d 839, 841 (D.C. Cir. 2002).

[6] On March 19, 2009, Test filed a motion for oral argument on the issue of the impact of the ADA Amendments Act on the present case.  Because the Court assumes for purposes of its analysis that Test is disabled under the Rehabilitation Act, no oral argument is necessary and Test's motion will be denied as moot.

and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not -- <u>and should not</u> -- decide whether the plaintiff actually made out a prima facie case under [<u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973)]. Rather, in considering an employer's motion for summary judgment . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of [his disability]?

<u>Brady v. Office of Sergeant of Arms</u>, 520 F.3d 490, 493 (D.C. Cir. 2008) (emphasis in original).

Test argues that he "was discriminated against when he was denied his request for a maxi-flex schedule while all the similarly situated GS-15 Directors were approved for a maxi-flex schedule." Pl. Mem. at 14. This, Test maintains, gives rise to an inference of discrimination because none of the other similarly situated directors are disabled. Defendant responds that the denial of Test's request had nothing to do with his disability. Rather, Test's request was denied because <u>no</u> similarly situated director was permitted to work the schedule Test sought. The key issues, then, are the kind of schedule Test requested and whether all (or any) similarly situated managers were permitted to work that schedule.

Test requested a "maxi-flex" schedule proposing that he work 44 hours one week and 36 hours the next, with every other Monday off. <u>See</u> Pl. Mem. Ex. 15. A "maxi-flex" schedule is one type of alternative work schedule that federal employees are permitted to choose under some circumstances. <u>See</u> 5 U.S.C. § 6122. The "basic work requirement" for a maxi-flex schedule is that an employee works 80 hours in a biweekly pay period. Pl. Mem. Ex. 14 at 4. Maxi-flex schedules can involve working every day with some short days and some long days. <u>Id.</u> at 6. They can also involve working fewer than ten days in a two-week period. <u>See id.</u> at 7-8 (setting forth examples of maxi-flex schedules in which employees work eight or nine days every two

weeks).  Maxi-flex schedules, unlike "compressed work schedules" -- another kind of alternative

work schedule -- do not involve a fixed day off.  Rather, employees working maxi-flex schedules

are required to discuss upcoming pay periods with their supervisors "to know what hours and

days they are working to ensure a proper accounting of employee time and attendance."  Id. at 5.

On the record before the Court, it appears that Test mislabeled his requested schedule; it was a

"compressed work schedule," not a "maxi-flex" schedule.

     Moreover, labels aside, no similarly situated GS-15 director was permitted to work the

schedule Test requested.  Although other GS-15 directors were permitted to work "maxi-flex"

schedules, see Pl. Mem. Ex. 13, none of them received a fixed day off every two weeks.  See

Holtzman Dep. at 241:18-21.  Holtzman explains that no GS-15 director received a fixed day off

because of the supervisory nature of their positions.  Id. at 241:3-8.

     The only portion of the record that Test cites to support his argument that every GS-15

director was permitted to take a fixed day off every two weeks does not, in fact, show that even a

single GS-15 director worked the schedule Test requested.  Test points to Michael Regardie, a

GS-15 manager whose work schedule was raised in Holtzman's deposition.  Pl. Mem. at 15.  The

cited portion of Holtzman's transcript reveals that Regardie -- who, like Test, was supervised by

Holtzman -- worked a maxi-flex schedule that often included short days on Fridays.  See

Holtzman Dep. at 193-210.  Over a four-month span, Regardie did not work at all on three

Fridays.  See id. at 193, 196, 199 (showing that Regardie did not work on March 31, 2006, May

26, 2006, or July 21, 2006).  But Holtzman's testimony does not demonstrate that Regardie

worked a schedule that provided a fixed day off every two weeks, as Test apparently requested.

Test does not point to any other portion of the record -- other than his own testimony -- to

support his contention that every other similarly situated manager received the schedule that he was denied.

Test's syllogism falls apart without a showing that he was treated differently than similarly situated managers. No reasonable jury could infer that Test was discriminated against because of his disability if no non-disabled managers received the treatment Test was denied. And Test has provided no other basis for inferring discrimination. See Pl. Mem. at 14; see also Pl.'s EEO Interview at 23:15-21 ("Q: Why do you contend that because of your physical disability your April the 28th, 2006 request for a Maxi Flex schedule was disapproved on May the 2nd, 2006? A: I know that the other division directors who are GS 15s all had their requests approved.").[7] Hence, even assuming that Test is disabled for purposes of the Rehabilitation Act, he has not demonstrated that he was discriminated against because of his disability.

## II.    Test's Prima Facie Case of Retaliation

Test alleges that he was retaliated against and subjected to a hostile work environment for seeking EEO review once his schedule request was denied. See Compl. ¶¶ 23-35. Test's allegations of retaliation fall into two categories: (1) his two-day suspension; and (2) various other actions, including circumvention of his authority and poor performance evaluations,

---

[7] Test also argues that his supervisors violated the statute governing alternative work schedules. See Pl. Mem. at 19-23 (citing 5 U.S.C. § 6122). Test's argument relies in part on the same premise that the Court has rejected above -- that every other GS-15 supervisor received the schedule that Test requested. In addition, Test interprets the statute as providing agency heads far less discretion than the actual statutory language appears to grant. See § 6122(b) (providing that an agency head may deny an alternative schedule request if he or she "determines that any organization within the agency . . . is being substantially disrupted in carrying out its functions or is incurring additional costs" because of the schedule.). On the record before the Court, Test's supervisors appear to have determined that the agency would be "substantially disrupted" if GS-15 supervisors received a fixed day off. See Holtzman Dep. at 241. Hence, the Court concludes that Test's supervisors did not violate § 6122 in denying Test's schedule request.

beginning in the summer of 2006.  The first step in analyzing such retaliation claims is to

determine whether the plaintiff has made out a prima facie case.  "'In order to establish a prima

facie case of retaliation, a plaintiff must show: (1) that he engaged in a statutorily protected

activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection

existed between the two.'" <u>Morgan v. Fed. Home Loan Mortgage Corp.</u>, 328 F.3d 647, 651 (D.C.

Cir. 2003) (quoting <u>Mitchell v. Baldrige</u>, 759 F.2d 80, 86 (D.C. Cir. 1985)).  The first element is

not in dispute for either category of allegedly retaliatory actions because Test's initiation of EEO

review constitutes statutorily protected activity.  The other two elements, however, are in dispute.

For Test's two-day suspension, defendant argues that there is no causal connection between Test's

EEO activity and the suspension because his supervisors were unaware of the EEO activity until

after they proposed the suspension.  For the second category of allegedly retaliatory actions,

defendant argues that no action is "adverse."  The Court takes each category of alleged retaliation

in turn.

*A.*     *Suspension*

        Defendant argues that the suspension could not have been retaliatory because Test's

supervisors did not learn about his EEO activity until after they had proposed the suspension.

Test met with Stacie Brockman, the EEO counselor, on May 18, 2006.  Holtzman, Test's

supervisor, issued the notice of proposed suspension on June 5, 2006, which was transmitted to

Test a week later.  Test responded to the proposed suspension on June 27, 2006, at which time he

revealed his EEO activity.  Defendant states that Test's response was the first time Test's

supervisors learned of the EEO activity.  Def. Mem. at 38.  Test was formally suspended -- for

two days rather than five as initially proposed -- on August 9, 2006.  If defendant is correct, then

Test cannot satisfy the third element required for a prima facie retaliation case -- a causal connection -- for the suspension claim, because the causal connection element requires that an employer know about protected activity before it can be inferred that an adverse employment action is retaliatory.  See Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).[8]

Test argues that "[d]efendant cannot legitimately claim that Mr. Holtzman and Mr. Fralick did not know that Mr. Test contacted the EEO Director" before proposing Test's suspension.  Pl. Opp. at 26.  Test contends that his supervisors must have known of his EEO activity for three reasons.  First, Test expressly asked Brockman to inform Test's supervisors that he had initiated EEO contact.  See EEO Report (attached as Def. Mem. Ex. B).  Second, Test avers that Beth McGarry, the Deputy Assistant Attorney General overseeing the EEO office, developed a computer application that monitored informal EEO activity.  See Pl. Opp. at 26.  Third, on May 23, 2006 -- five days after Test's first EEO activity -- "Mr. Holtzman walked into Mr. Test's office, and stated: 'people here are gunning for you.'"  Id. at 3 (paraphrasing Holtzman Dep. at 59-60).

To begin with, although Test asked Brockman to inform Holtzman and Fralick of Test's EEO activity, Brockman declares that "I notified Mr. Test's . . . supervisors, Kyle Holtzman and Gerald Fralick, about the complaint on July 6, 2006, via email.  This was the first notice provided

_____

[8] Test characterizes the causal connection element as requiring mere "close proximity" between protected activity and an adverse employment action.  See Pl. Opp. at 20 (citing, inter alia, Moses v. Howard Univ. Hosp., 474 F. Supp. 2d 117 (D.D.C. 2007)).  But courts examining temporal proximity between protected activity and adverse employment actions still require a showing that the employer had knowledge of the protected activity.  See Moses, 474 F. Supp. 2d at 124 ("A plaintiff may establish a causal connection between his participation in a protected activity and an adverse action through temporal proximity alone by showing that (1) the employer knew that the plaintiff engaged in protected activity, and that (2) the adverse action took place shortly after plaintiff's participation in that activity.") (emphasis added).

by my office to Mr. Holtzman or Mr. Fralick."  Declaration of Stacie Brockman at 2 (attached as Def. Mem. Ex. W).  Test counters that Brockman's declaration "is not credible," but provides no reason for the Court to disbelieve her.  Pl. Opp. at 27.  Without more, Brockman's declaration shows that if Test's supervisors received notice of Test's EEO activity before proposing his suspension, they did not receive it from Brockman.

The next question is whether Test's supervisors learned of his EEO activity through a computer application that Test claims monitors such activity.  See Pl. Mem. at 24-25 n.17.  Test submits a declaration from Lorenzo Moore, the Director of the Enterprise Applications Support Division at OJP, who declares that "OJP has an application that alerts Ms. Beth McGarry whenever an informal EEO complaint is initiated."  Declaration of Lorenzo Moore ¶ 11 (attached as Pl. Mem. Ex. 11); see also id. ¶ 12 ("During my tenure with OJP, I was tasked to develop a computer application . . . to keep Ms. McGarry fully informed of events occurring during both the informal and the formal EEO process.").  Because of this application, Test argues, his supervisors must have known of his EEO activity before proposing his suspension.  Pl. Opp. at 26-27.  Defendant, on the other hand, stands by Test's supervisors' sworn statements that they were unaware of Test's EEO activity until he filed his response to the notice of proposed suspension.  See Holtzman EEO Interrogatory at 8 ("Until [plaintiff] advised [Mr. Fralick], in his response to the Proposed Notice, that he had gone to the EEO Director, I was unaware that [plaintiff] had contacted the EEO Director.") (attached as Def. Mem. Ex. J); Fralick EEO Interrogatory at 11 ("Not until I received Mr. Test's June 27, 2006[] response, in which he alleged that he had sought EEO counseling[,] was I aware of his contact with the EEO system.") (attached as Def. Mem. Ex. K).  Moreover, defendant points out that Moore's declaration does

-12-

not state whether the application was functional in May 2006.  Nor does Test point to any evidence to suggest that McGarry actually used the monitoring application, and even if she did, that she reported to Test's supervisors that Test had visited an EEO counselor.

The Court must determine whether the existence of an EEO monitoring application, contrasted with Holtzman's and Fralick's sworn statements that they lacked knowledge of Test's EEO activity before proposing his suspension, creates the kind of genuine issue of material fact that will defeat summary judgment.  See Fed. R. Civ. P. 56(c).  On the one hand, defendant has provided testimony from Holtzman and Fralick in which they flatly state that they did not learn of Test's EEO activity until June 27, 2006.  On the other hand, Test has provided evidence suggesting that it may have been possible for his supervisors to learn of his EEO activity independently of Brockman through a computer application.  Test's belief that his supervisors must have known of his EEO activity because of the computer application depends, at least, on a showing that:  (1) a monitoring application was created; (2) it was in place in May 2006; (3) it was actually used by McGarry; and (4) McGarry likely shared that information with Test's supervisors.  But Test has only made a showing as to (1), and without (2), (3), and (4), his argument is mere speculation.  When confronted with unequivocal sworn statements denying knowledge, as here, "'mere speculation' . . . fails to create a genuine issue of material fact to avoid summary judgment."  See Esquibel v. Lahood, Civ.A.No. 06-1485, 2009 WL 824743 at *4 (D.D.C. Mar. 31, 2009); see also Doe v. Gates, 981 F.2d 1316, 1323 (D.C. Cir. 1993) (holding that when confronted with "abundant evidence of the nonexistence of [a] . . . blanket policy," a non-movant must "at least have provided some direct evidence of someone having knowledge of that policy asserting it to exist . . . .  Absent that, he has cast no more than 'metaphysical doubt'"

and summary judgment may be appropriate.).  Hence, the Court concludes that no reasonable

jury could find that the potential existence of a computer monitoring mechanism defeats Test's

supervisors' sworn statements that they did not know of Test's EEO activity until after they

proposed his suspension.

Finally, the record shows that on May 23, 2006, Holtzman entered Test's office and stated

that people were "gunning" for Test.  See Pl.'s EEO Interview at 57.  Defendant points out that

Test's own recollection of the incident reveals that Holtzman "said that people were gunning for

me, and later he changed that to us."  Id.  Defendant contends that this demonstrates that

Holtzman's statement had nothing to do with Test's EEO activity; rather, the statement was a

product of a high stress environment at OJP, which was undergoing an audit.  See Def. Opp. at

38.  Test responds that Holtzman "specifically referenc[ed] plaintiff's EEO activity," which

demonstrates that Holtzman knew of Test's EEO activity well before proposing his suspension.

But the record reveals that Test overstates his case.  Nothing in the record demonstrates that

Holtzman referenced or even alluded to Test's EEO activity on May 23, 2006.  To be sure,

Holtzman did specifically refer to Test's EEO activity in a later confrontation on July 6, 2006 --

but that was after Holtzman learned of that activity through Test's response to the notice of

proposed suspension.

In sum, Test has not made a prima facie case that his suspension was retaliatory.  His

supervisors did not know about his EEO activity until he submitted his response to the notice of

proposed suspension.  Brockman, the EEO counselor, declares that she did not inform Test's

supervisors about her May 18, 2006 meeting with Test until much later, on July 6, 2006.  Even if

OJP developed a computer application that monitored informal EEO activity, nothing in the

record demonstrates that it was functional in May 2006 and that it provided anyone with notice of Test's EEO activity.  And Holtzman's statement that people were "gunning" for Test (before amending his statement to people are gunning for "us") does not show that Holtzman must have known of Test's EEO activity, because Holtzman made no reference to Test's EEO activity.  Hence, the Court concludes that Test's supervisors only received notice of Test's protected activity after they had proposed Test's suspension.  Accordingly, Test cannot satisfy the "causal connection" requirement of a prima facie retaliation case as to his suspension.

B.      *Test's Remaining Retaliation & Hostile Work Environment Claims*

Defendant argues that the only issues properly before the Court are the denial of Test's schedule request and Test's suspension.  See Def. Mem. at 16-18.  Defendant points out that Brockman outlined only those two claims when informing Test which claims would be investigated by the EEOC.  Defendant contends that Test's failure to register disagreement with Brockman constitutes a failure to exhaust administrative remedies for his remaining retaliation claims.

To be sure, retaliation claims must be administratively exhausted before relief may be sought in federal district court.  Park v. Howard Univ., 71 F.3d 904, 907 (D.C. Cir. 1995).  But the standard is not as demanding as defendant would have it.  A suit "following the EEOC charge is limited in scope to claims that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'"  Id. (quoting Cheek v. Western and Southern Life Ins. Co., 31 F.3d 497, 500 (7th Cir. 1994)).  "At a minimum," a suit "must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'"  Id. (quoting Chisholm v. U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981)).  Here, although

-15-

Brockman's letter to Test did not set out all of the actions of which Test now complains here, the record demonstrates that the EEOC knew that Test's complaints were not limited to the schedule request denial and his later suspension.  For example, in Test's EEO interview, he complained of the same verbal abuse that he now alleges was retaliatory and contributed to a hostile work environment.  See Pl.'s EEO Interview at 53.  Hence, Test's remaining retaliation claims are "reasonably related" to the claims set forth in Brockman's letter to Test, and he properly exhausted his claims before bringing suit.

Test's remaining retaliation/hostile work environment claims are as follows:  scheduling meetings expecting that Test would not be able to attend, Compl. ¶ 24; verbally "assaulting" Test, id. ¶¶ 28, 34; undermining Test's authority and reducing his workload, id. ¶¶ 18-19, 23, 30; locking Test out of the building, id. ¶ 31; issuing him an unfavorable performance evaluation, id. ¶ 32; denying him a performance award, id. ¶ 33; and refusing to discuss his "individual development plan" with him, id. ¶ 35.

Defendant does not contest that any of these allegedly retaliatory acts occurred.  Rather, defendant argues that, as a matter of law, no single action qualifies as "adverse."  Def. Mem. at 18-27.  For retaliation claims, an action is adverse if a plaintiff can show "that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (some quotations omitted).  The standard is phrased in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters."  Id. at 69.  Courts cannot

examine whether any isolated action, on its own, qualifies as "adverse."  Instead, courts must

consider whether "based upon the <u>combined effect</u> of . . . alleged events, a reasonable worker

could be dissuaded from engaging in protected activity."  <u>Hill v. Kempthorne</u>, 577 F. Supp. 2d

58, 67 (D.D.C. 2008) (emphasis added); <u>see also</u> <u>Phillips v. Collings</u>, 256 F.3d 843, 849 (8th Cir.

2001) ("[W]e consider the cumulative effect of [the employer's] discriminatory actions rather

than determining whether any individual action upon which the claim relies was sufficiently

adverse.").

Here, the combined effect of the actions taken by Test's supervisors after they knew of

Test's EEO activity -- indeed, Holtzman told Test that Test's EEO complaint was "killing" him --

could dissuade a reasonable worker from initiating EEO review and hence qualify collectively as

an "adverse" action.  With regard to the seven actions taken by Test's supervisors after June 27,

2006, then, Test has made a prima facie case of retaliation.

III.    **Evaluation of Test's Retaliation and Hostile Work Environment Case**

Once a plaintiff establishes a prima facie case, the burden shifts to the defendant to

articulate a legitimate, nondiscriminatory reason for its actions.  <u>McDonnell Douglas Corp. v.</u>

<u>Green</u>, 411 U.S. 792, 802 (1973).  The employer "need not persuade the court that it was actually

motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine

issue of fact as to whether it discriminated against the plaintiff."  <u>Texas Dep't of Cmty. Affairs v.</u>

<u>Burdine</u>, 450 U.S. 248, 254–55 (1981).  When the defendant has articulated a legitimate reason

for its actions, the <u>McDonnell Douglas</u> burden-shifting framework effectively evaporates -- the

sole remaining issue is retaliation <u>vel non</u>, and "to survive summary judgment the plaintiff must

show that a reasonable jury could conclude from all of the evidence" that the adverse action was

retaliatory.  Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003); see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000).  Here, Test has made a prima facie case based on seven allegedly retaliatory events, and defendant has set forth a reason for each.  The Court will examine each event to determine whether a reasonable jury could conclude that it was retaliatory, either on its own or collectively.

First, Test alleges that his supervisors "regularly held critical managers' meetings" during hours when plaintiff was not scheduled to work.  Pl. Mem. at 36; Compl. ¶ 24.  Defendant simply responds that "[t]he needs of the office did not cease when plaintiff's tour of duty ended."  Def. Opp. at 43.  Based on these sparse arguments and the dearth of evidence in the record on this question, the Court cannot determine whether a reasonable jury would find that regularly scheduling meetings when Test was absent was (or was not) retaliatory.

Next, Test alleges that he was verbally "assaulted" by his supervisors.  Compl. ¶¶ 28, 34.  In particular, Test points to a confrontation with Holtzman in which Holtzman stated that Test was "killing" him with his EEO complaint.  Pl. Mem. at 33.  Holtzman explains that he made the comment because "we both had an extremely high workload and it was stressful between us so I was trying to make light of the situation."  Holtzman Dep. at 60.  Defendant also points to Test's deposition, in which Test stated that "[t]he office was always in the middle of turmoil and bickering . . . [Yelling] was not an uncommon occurrence."  Test Dep. at 79.  Reasonable jurors could differ as to whether Test was singled out for verbal "assault" after his supervisors learned of his EEO activity.

Test's third allegation is that his supervisors undermined his authority and reduced his workload once they learned of his EEO activity.  Compl. ¶¶ 18-19, 23, 30.  Defendant responds

that Test's workload was reduced because "there w[ere] significant performance issues with . . . Test from day one."  Holtzman Dep. at 154.  Defendant also submits a declaration from McGarry, in which she states that she was "very dissatisfied" with Test's work.  Declaration of Beth McGarry at 6 (Def. Opp. Att. E).  But this evidence is belied by defendant's own performance evaluation of Test, which shows that his supervisors considered him to be a "successful" manager -- the "rating record" between "excellent" and "minimally satisfactory."  See Pl. Mem. Ex. 21.  A jury could reasonably come to differing conclusions in assessing whether Test's supervisors reduced his workload for performance-related or retaliatory reasons.

　　　　Test's fourth and fifth allegations are also related to his performance.  He alleges that he was given a "poor" performance evaluation and accordingly was denied a performance award.  Pl. Mem. at 35, 37; Compl. ¶¶ 32-33.  Defendant points out that Test did not receive a "poor" performance evaluation -- his evaluation was satisfactory.  See Pl. Mem. Ex. 21; see also Holtzman Dep. at 253 (describing Test's performance as "satisfactory").  And based on OJP policy, employees receiving a satisfactory evaluation do not receive a performance-related bonus.  Id.  Although Test describes himself as a "stellar" employee at OJP, Pl. Mem. at 2, nothing in the record substantiates that description.  The only portion of the record that reflects Test's prior performance evaluation at OJP is his own interview testimony, in which he recalled his supervisors telling him that "everything looks pretty good, things are going pretty well" during his mid-year review.  See Pl.'s EEO Interview at 16.  But that testimony shows only that Test's job performance was satisfactory, not stellar.  There is no evidence to suggest that Test was entitled to a more favorable performance evaluation than he received.  No reasonable jury, then, could find that his performance evaluation was retaliatory.

Sixth, Test alleges that he was locked out of his office building for several hours on the first workday after completing his suspension.  Compl. ¶ 31.  But defendant points to deposition testimony from Test's supervisor, Fralick, who states that this was an honest mistake.  Def. Opp. at 44.  Whether Fralick made an honest mistake is a credibility question for the jury.

Finally, Test alleges that his supervisors' refusal to discuss an individual development plan with him was retaliatory.  Compl. ¶ 35.  Defendant responds that the decision as to when and how such a plan should be reviewed and updated is left to the discretion of a supervisor.  Def. Opp. at 44.  There is no fixed date by which a supervisor must review the plan.  See Guidance for Creating the Individual Development Plan (attached as Def. Mem. Ex. R).  Whether Test's supervisors in fact refused to discuss the plan with Test for retaliatory reasons or whether they merely decided that review of the plan was unnecessary is a question for the jury.

In sum, then, this assessment results in a conclusion that the Court will grant summary judgment in favor of defendant on two of the seven actions for which Test has made a prima facie case:  the allegations that Test's satisfactory performance evaluation was retaliatory and that the denial of a performance-related bonus to Test was retaliatory.  For the remaining five actions, a reasonable jury could differ as to whether specific actions, or all five actions collectively, were retaliatory or not, and hence summary judgment must be denied.

## CONCLUSION

Test's disability discrimination claim fails because he was not treated differently than similarly situated employees.  He has not made a prima facie case of retaliation as to his suspension because his supervisors were unaware of his EEO activity until after they proposed his suspension.  Test has, however, established a prima facie case of retaliation as to the

remaining seven allegedly retaliatory actions, although defendant has provided legitimate, non-discriminatory reasons for two of those actions -- his performance evaluation and the denial of a performance-related bonus.  Accordingly, Test's summary judgment motion will be denied in full and defendant's summary judgment motion will be granted in part and denied in part.  A separate order accompanies this opinion.

_____/s/ John D. Bates_____
JOHN D. BATES
United States District Judge

Date: May 15, 2009